1  ROBBINS LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsllp.com
   SHANE P. SANDERS (237146)
3  ssanders@robbinsllp.com
   GREGORY E. DEL GAIZO (247319)
4  gdelgaizo@robbinsllp.com
   MATIAS MONTILLANO (323282)
5  mmontillano@robbinsllp.com
   5040 Shoreham Place
6  San Diego, CA 92122
   Telephone: (619) 525-3990
7  Facsimile: (619) 525-3991

8  Attorneys for Plaintiff

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11 HOWARD PETRETTA, Derivatively on          )   Case No.:
   Behalf of PINTEREST, INC.,                )
12                                           )
                    Plaintiff,               )   VERIFIED STOCKHOLDER DERIVATIVE
13       v.                                  )   COMPLAINT FOR BREACH OF
                                             )   FIDUCIARY DUTY AND UNJUST
14 BENJAMIN SILBERMANN, EVAN                 )   ENRICHMENT
   SHARP, TODD MORGENFELD, ANDREA            )
15 WISHOM, JEREMY S. LEVINE, JEFFREY         )
   JORDAN, FREDRIC G. REYNOLDS,              )
16 LESLIE J. KILGORE, GOKUL RAJARAM,         )
   and MICHELLE WILSON,                      )
17                                           )
                    Defendants,              )
18                                           )
         -and-                               )
19                                           )
   PINTEREST, INC., a Delaware Corporation,  )
20                                           )
                    Nominal Defendant.       )   DEMAND FOR JURY TRIAL
21 _____)

22

23

24    __**REDACTED VERSION OF PORTIONS OF COMPLAINT SOUGHT TO BE SEALED**__

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of documents provided to plaintiff for inspection in response to his inspection demand pursuant to 8 *Del. C.* §220 (the "Section 220 Documents"), a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Pinterest, Inc. ("Pinterest" or the "Company") against certain of its officers and directors for breach of fiduciary duty, unjust enrichment, and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Pinterest's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Pinterest to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Pinterest is an image sharing and social media website that allows users to collect images and links to create virtual "pinboards" based on their interests.  The website was launched in March 2010, and has grown to become one of the largest social media platforms in the world.  In fact, Pinterest currently reaches 459 million monthly active users, and recognizes that about two-thirds of its user base are female.  Pinterest is often called the "nicest company in Silicon Valley," driven by its purported promotion of its "inspiring environment" and a workplace culture that fosters diversity and inclusion.  Pinterest's rapid growth led to a successful initial public offering ("IPO") on April 18, 2019, with a $10 billion valuation.

3.      Unfortunately, Pinterest's claims of creating an inspiring work environment are false.  In truth, Pinterest has created a toxic workplace culture grounded in abuse and discrimination against its own employees.  This toxic work environment has bubbled internally for years, and only recently has the truth about Pinterest's culture surfaced, leading to a user boycott, employee walkout, financial harm, and irreparable damage to the Company's reputation.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

4.     This discriminatory culture begins with Pinterest's cofounder and Chief Executive Officer ("CEO"), defendant Benjamin Silbermann ("Silbermann").  According to several former employees, defendant Silbermann repeatedly placed himself before the Company, surrounding himself with yes-men and marginalizing women who dared to challenge Pinterest's White male leadership.  When these marginalized employees tried to speak out, they were silenced or ignored.

5.     Unfortunately, this tone at the top has normalized gender and race discrimination at Pinterest's leadership levels.  ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████

6.     Defendant Silbermann addressed Pinterest's internal toxic culture only when reports about the Company's hypocrisy surfaced in the public in the summer of 2020.  In particular, two senior-level, Black female employees went public with allegations of pervasive racial discrimination and retaliation at the Company.  Despite leading some of Pinterest's most high-profile initiatives, these senior-level employees were underpaid compared to their White male colleagues.  Furthermore, these employees experienced repeated instances of racial and gender abuse by senior executives.  These employees separately filed complaints with California's Department of Fair Employment and Housing ("DFEH"), alleging pay discrimination and retaliation.  Their claims have since been confidentially resolved.

7.     In response to these public disclosures, defendant Silbermann was forced to admit that "parts of our culture are broken."

8.     As news agencies began to investigate Pinterest's workplace culture, they discovered that these experiences were not isolated cases.  "Instead, they are representative of an organizational culture that hurts all Pinterest workers."  In solidarity with their former colleagues, on August 14, 2020, hundreds of Pinterest employees staged a virtual walkout, demanding greater transparency for pay and increased diversity among the Company's leadership.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Soon after they came forward, Pinterest's former Chief Operating Officer ("COO"), Francoise Brougher ("Brougher"), sued Pinterest for gender discrimination, wrongful termination, and retaliation. According to Brougher, she was left out of key meetings, given inappropriate gender-based feedback, and was also severely underpaid compared to her male colleagues. When Brougher approached defendant Silbermann about her mistreatment at the Company, she was fired. On August 11, 2020, Brougher filed her lawsuit in the Superior Court of the State of California for the County of San Francisco. The Company settled the lawsuit on December 14, 2020, paying Brougher $22.5 million, as reportedly the largest publicly announced settlement for an individual gender discrimination lawsuit in history.

**JURISDICTION AND VENUE**

9.      Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Pinterest, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**INTRADISTRICT ASSIGNMENT**

12.      A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of San Francisco. A related derivative action is pending in the San Francisco division of this Court and therefore, this action is properly assigned to the San Francisco division.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

**THE PARTIES**

2 **Plaintiff**

3        13.     Plaintiff Howard Petretta has continuously been a stockholder of Pinterest since May

4 2019.  Plaintiff is a citizen of Alabama.

5 **Nominal Defendant**

6        14.     Nominal defendant Pinterest is a Delaware corporation with principal executive offices

7 located at 505 Brannan Street San Francisco, California.  Accordingly, Pinterest is a citizen of Delaware

8 and California.  Pinterest operates and maintains a social networking website that the Company describes

9 as a virtual discovery engine.  As of December 31, 2020, the Company had 2,545 full-time employees.

10 **Defendants**

11        15.     Defendant Silbermann is Pinterest's Cofounder, President, and CEO and has been since

12 2012; Chairman of the Board and has been since at least 2019, and a director and has been since 2008.

13 Defendant Silbermann knowingly, recklessly, or with gross negligence permitted and deliberately

14 enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid

15 defendant Silbermann the following compensation as an executive:

16

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2020 | $197,100 | - | $2,000 | $199,100 |
| 2019 | $197,100 | $45,745,013 | $280,000 | $46,222,113 |
| 2018 | $197,100 | - | - | $197,100 |

19 Defendant Silbermann is a citizen of California.

20        16.     Defendant Evan Sharp ("Sharp") is Pinterest's Cofounder and Chief Design & Creative

21 Officer and has been since 2011, and a director and has been since March 2019.  Defendant Sharp

22 knowingly, recklessly, or with gross negligence permitted and deliberately enabled a culture of

23 discrimination against women and people of color at Pinterest.  Pinterest paid defendant Sharp the

24 following compensation as an executive:

25

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2020 | $330,000 | - | $2,000 | $332,000 |
| 2019 | $330,000 | $45,745,013 | - | $46,075,013 |

28 Defendant Sharp is a citizen of California.

17.     Defendant Todd Morgenfeld ("Morgenfeld") is Pinterest's Chief Financial Officer ("CFO") and has been since November 2016, and Head of Business Operations and has been since May 2020.  Defendant Morgenfeld knowingly, recklessly, or with gross negligence permitted and deliberately enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid defendant Morgenfeld the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2020 | $360,500 | 10,611,517 | $2,000 | $10,974,017 |
| 2019 | $360,500 | - | - | $360,500 |
| 2018 | $360,500 | $22,028,696 | - | $22,389,196 |

Defendant Morgenfeld is a citizen of California.

18.     Defendant Andrea Wishom ("Wishom") is Pinterest's Lead Independent Director and has been since May 2021, and a director and has been since August 2020.  Defendant Wishom is a member of Pinterest's Talent Development and Compensation Committee and has been since at least April 2021.  Defendant Wishom knowingly, in bad faith, or in conscious disregard for her duties permitted and deliberately enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid defendant Wishom the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|-------------|-----------------------------|--------------|-------|
| 2020 | $25,000 | $399,984 | $424,984 |

Defendant Wishom is a citizen of Illinois.

19.     Defendant Jeremy S. Levine ("Levine") is a Pinterest director and has been since April 2011.  Defendant Levine knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid defendant Levine the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|-------------|-----------------------------|--------------|-------|
| 2020 | $60,000 | $249,984 | $309,984 |
| 2019 | $45,000 | $249,996 | $294,996 |

Defendant Levine is a citizen of New York.

20.     Defendant Jeffrey Jordan ("Jordan") is a Pinterest director and has been since October 2011.  Defendant Jordan knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid defendant Jordan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $55,000 | $249,984 | $304,984 |
| 2019 | $41,250 | $249,995 | $291,245 |

Defendant Jordan is a citizen of California.

21.     Defendant Fredric G. Reynolds ("Reynolds") is a Pinterest director and has been since December 2017.  Defendant Reynolds is Chair of Pinterest's Audit Committee and a member of that committee and has been since at least April 2019.  Defendant Reynolds knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid defendant Reynolds the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $75,000 | $249,984 | $324,984 |
| 2019 | $56,250 | $249,995 | $306,245 |

Defendant Reynolds is a citizen of Florida.

22.     Defendant Leslie J. Kilgore ("Kilgore") is a Pinterest director and has been since March 2019.  Defendant Kilgore is Chair of Pinterest's Talent Development and Compensation Committee and has been since May 2021, and a member of that committee and has been since April 2019.  Defendant Kilgore was also a member of Pinterest's Audit Committee in at least April 2019.  Defendant Kilgore knowingly, in bad faith, or in conscious disregard for her duties permitted and deliberately enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid defendant Kilgore the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $72,500 | $249,984 | $322,484 |
| 2019 | $54,375 | $652,153 | $706,528 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Defendant Kilgore is a citizen of California.

23.     Defendant Gokul Rajaram ("Rajaram") is a Pinterest director and has been since February 2020.  Defendant Rajaram is also a member of Pinterest's Talent Development and Compensation Committee and has been since at least June 2021.  Defendant Rajaram knowingly, in bad faith, or in conscious disregard for his duties permitted and deliberately enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid defendant Rajaram the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $50,417 | $649,980 | $700,397 |

Defendant Rajaram is a citizen of California.

24.     Defendant Michelle Wilson ("Wilson") was Pinterest's Lead Independent Director from at least April 2020 to May 2021, and a director from 2016 to May 2021.  Defendant Wilson was also Chair of Pinterest's Talent Development and Compensation Committee and a member of that committee from at least April 2019 to at least April 2021.  Defendant Wilson was also a member of Pinterest's Audit Committee from at least April 2019 to at least April 2020.  Defendant Wilson knowingly, in bad faith, or in conscious disregard for her duties permitted and deliberately enabled a culture of discrimination against women and people of color at Pinterest.  Pinterest paid defendant Wilson the following compensation as a  director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $102,500 | $249,984 | $352,484 |
| 2019 | $76,875 | $249,995 | $326,870 |

Upon information and belief, defendant Wilson is a citizen of Washington.

25.     The defendants identified in ¶¶15-17 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶15-16, 18-24 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶21-22, 24 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶15-24 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Pinterest and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Pinterest in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Pinterest and not in furtherance of their personal interest or benefit.

27.    To discharge their duties, the officers and directors of Pinterest were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Pinterest were required to, among other things:

(a)    ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations;

(b)    ensure that the Company complied with its legal obligations and requirements and refrained from engaging in discriminatory conduct;

(c)    ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics and compliance;

(d)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)    remain informed as to how Pinterest conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

28.    Pinterest allegedly holds its fiduciaries to specific corporate principles.  In particular, in the Company's Corporate Governance Guidelines, Pinterest describes the duties undertaken by the Board and the active oversight role the Board plays in the Company's business affairs.  In particular, the

Corporate Governance Guidelines state that the Board is responsible for:

- overseeing and reviewing the Company's strategic direction and objectives, taking into account (among other considerations) the Company's risk profile and exposures and its relationships with key stakeholders;

- selecting, evaluating and compensating the Chief Executive Officer ("CEO") and other key executives, and planning for CEO and key executive succession;

- overseeing the Company's compliance with applicable legal and regulatory requirements and the processes that are in place to safeguard the Company's assets and manage material risks;

29.     The Individual Defendants, as officers and directors of Pinterest, were also bound by the Company's Code of Business Conduct and Ethics (the "Code"). The Code sets out basic principles to guide all directors, officers, and employees of Pinterest who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior. In particular, the Code provides:

> At Pinterest, we respect all applicable law, including local laws and regulations that apply to our business.

> *        *        *

> As an employer, Pinterest has personal data about its employees and other staff around the world. Access and use such data only in connection with a legitimate business purpose, in accordance with Pinterest policies and applicable law.

30.     The Code further provides that Pinterest employees, including its officers and directors, must promote a "diverse and inclusive workforce." In particular, the Code states:

> **Diversity and inclusion**
> Pinterest strives to build products and services that inspire everyone. Having a diverse and inclusive workforce is critical to achieving this aspiration. By bringing together different talents and perspectives into a room, we will accelerate our progress in product development, growth, monetization and other key strategies. Pinterest values your individual backgrounds, experiences, differences, and capabilities, and expects you to do the same with your colleagues.

> **Equal employment opportunities**
> We want to have the best qualified people in every job. Pinterest is an equal opportunity employer and makes employment decisions on the basis of merit. We prohibit unlawful discrimination based on race, color, ethnicity, national origin, religion, sex (including pregnancy, childbirth, or related medical conditions), sexual orientation, gender, gender

identity, gender expression, age, marital status, status as a protected veteran, physical or mental disability, medical condition, genetic information or characteristics (or those of a family member), or any other consideration made unlawful by applicable federal, state, or local laws.   Discrimination based on a perception that anyone has any of those characteristics, or is associated with a person who has or is perceived as having any of those characteristics, is also prohibited.   Pinterest expects you to adhere to Pinterest's policies and the law in this regard.

**Harassment and discrimination**
Pinterest is committed to providing a work environment that is free of discrimination, harassment, mistreatment and retaliation.

## FACTUAL BACKGROUND

31.     Pinterest is an image sharing and social media website that allows users to collect images and links to create virtual "pinboards" based on their interests.  Defendants Silbermann and Sharp and nondefendant Paul Sciarra ("Sciarra") first launched the site in March 2010.  Pinterest immediately became a worldwide success, with *TIME magazine* listing Pinterest as one of the "50 Best Websites of 2011" in August 2011.  According to Hitwise data, Pinterest became one of the top ten largest social network services in 2011, with eleven million total visits per week.

32.     Pinterest's rapid growth is due in large part to significant early investment from venture capital firms Andreessen Horowitz and Bessemer Venture Partners.  Both firms were involved in the Company's $27 million Series B round in 2011, and again participated in a $100 million investment round in 2012.

33.     Pinterest went public on April 18, 2019 at $19 a share, with a $10 billion valuation.  As of Pinterest's Annual Report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 Form 10-K") filed with the SEC on February 5, 2021, defendants Silbermann and Sharp, Sciarra, and other long-term investors (including Andreessen Horowitz and Bessemer Venture Partners), hold over 78% of the Company's vote.  As a result of this control, defendant Silbermann and his longtime allies decide the makeup of the Board and control the appointment and removal of directors.

34.     Pinterest admits the impact of this concentration of control in its 2020 Form 10-K.  The 2020 Form 10-K states that "[t]he dual class structure of our common stock has the effect of concentrating voting control with those stockholders who held our capital stock prior to the completion of our initial public offering ('IPO') including our co-founders" and "other pre-IPO stockholders" which "will limit or

preclude your ability to influence corporate matters."

35.     As the *New York Times* noted at the time of the IPO, Pinterest's system of "super-voting shares undermines the system of accountability that has long been a pillar of public stock markets" and "can give insiders too much power and insulate executives who make poor decisions."

**Pinterest Aggressively Promotes Itself as an Inspirational, Diverse, and Inclusive Company**

36.     Pinterest repeatedly brands itself as "inspirational."  As the 2020 Form 10-K explains, the Company's "inspiring, creative environment" is "rare on the internet" for users.  In particular, the 2020 Form 10-K states:

> On Pinterest, businesses have the opportunity to showcase their products and services in an inspiring, creative environment.  This is rare on the internet, where consumers' digital experiences can be stressful or negative, and brands can get caught in the crossfire.  We believe that the inspirational and constructive feelings that many people experience on Pinterest make our site an especially effective environment for brands and creators to build an emotional connection with consumers.

37.     Pinterest has also largely appealed to women.  According to the 2020 Form 10-K, "Pinterest reaches 459 million monthly active users, about two-thirds of whom are female."  Moreover, Pinterest is keenly attuned to average revenue earned per user, which is how the Company attracts advertisers.  As such, the Company's reputation and goodwill among its female user base is critical.

38.     Pinterest also publicly states that it focuses on diversity and inclusion in it is work force.  Indeed, Pinterest made a public commitment in 2015 to hold themselves accountable for building a diverse team in a statement titled "Our Plan for a More Diverse Pinterest."  According to its website, Pinterest, like many other companies, purportedly:

> [P]rohibits unlawful discrimination based on race, color, ancestry, national origin, religion or religious creed, sex (including pregnancy, childbirth, or related medical conditions), sexual orientation, gender, gender identity, gender expression, age, marital status, status as a protected veteran, physical or mental disability, medical condition, genetic information, or characteristics (or those of a family member), or any other consideration made unlawful by applicable federal, state, or local laws.

39.     Thus, Pinterest has long recognized that its ability to attract and retain a diverse workforce is crucial to its success.  Further highlighting this philosophy, in an article published on August 7, 2019, defendant Sharp emphasized the importance of diverse representation to Pinterest's success.  In particular, he stated, "[d]iverse perspectives—from both people on our teams and people using our products—are

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

invaluable. … It's hard to solve for the real problem if you can't relate to someone's real experience." Defendant Sharp added that diverse teams "produce the best outcomes for our users."

40.     Similarly, in a press release issued on January 16, 2020, Pinterest's Chief Human Resources Officer wrote, "research shows that diverse teams make us more creative, diligent and hard working.  When we are building products, a team of people with different backgrounds enables us to think through products, policies, and safety from all angles.  …  Inclusion and diversity is not only a value; it's foundational to making the best decisions and building the strongest teams over time."

## THE INDIVIDUAL DEFENDANTS FOSTER AND PERMIT A CULTURE OF DISCRIMINATION AND RETALIATION ON THE BASIS OF RACE AND GENDER

41.     Despite their marketing claims that Pinterest focuses on diversity and inclusion, the Individual Defendants have internally fostered and permitted a culture of discrimination, harassment, and retaliation at the Company.  Not only is this culture of discrimination, harassment, and retaliation contradictory to Pinterest's express claims that it is an equal opportunity employer, it is in fact unlawful under federal and state laws and regulations.

42.     Title VII of the Civil Rights Act of 1964 ("Title VII") is a federal law that prohibits discrimination in employment on the basis of sex, race, color, national origin, and religion.  Title VII also makes it illegal to retaliate against a person who complains about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.

43.     Employment discrimination is also prohibited in California, where Pinterest operates its businesses and where the misconduct took place.  *See* Gov. Code §12920 ("It is hereby the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status.").  Employment discrimination is similarly prohibited in Delaware, where Pinterest is incorporated.  *See* Del. Code Ann tit. 19, §711A (West 2019).

44.     Although the Company has publicly committed to promoting a culture of diversity, inclusion, and inspiration in the workplace, Pinterest's top brass have, for years, engaged in long-standing, systemic, and unlawful discriminatory practices on the basis of race and gender.

45.     In 2020, three senior female employees of Pinterest—Brougher, Ifeoma Ozoma ("Ozoma"), and Aerica Shimizu Banks ("Banks")—separately alleged that the Company's senior executives engaged in unlawful discrimination against them.  According to these senior employees, Pinterest's leadership internally encouraged a systemic culture of discrimination, while publicly promoting that Pinterest had a work culture of inclusion and diversity.

46.     Brougher, Ozoma, and Banks further alleged that Pinterest's leadership is dominated by a male clique made up of individuals close to defendant Silbermann.  This clique promoted a toxic corporate culture where female and minority employees were underpaid, marginalized, and forced out on the basis of their diverse status, without regard to their significant financial and operational achievements during their tenure at Pinterest.

**Pinterest's Former COO Alleges Gender and Pay Discrimination**

47.     Brougher has been a high-powered technology executive in the Silicon Valley for over two decades.  She has served at some of the valley's most prestigious and successful companies, including Charles Schwab, Google, and Square.  Brougher's professional experience is extraordinary.

48.     For example, Brougher led Google's BizOps group during a period of exponential growth.  She headed large scale acquisitions and led Google's initial expansion into Africa.  She also led a $16 billion ad sales division with thousands of people reporting to her, rapidly growing revenues from the single digits to over 25% in her business segment.  At Square, Brougher helped the smaller company scale and define its business strategy.  She worked on initiatives such as expanding Square's customer base to include larger retailers, creating Square's partner ecosystem, and redefining its go-to-market strategy.  Brougher was part of the leadership team that took Square public.

49.     In March 2018, Brougher joined Pinterest as COO, accepting the position under the guise that she would be judged and compensated based on her job performance.  In fact, the Company recognized Brougher's expected role in a press release issued on February 27, 2018, which stated that

"Brougher will be instrumental in bringing the company through its next phase of growth as it continues to expand its user base internationally and scale its global advertising program."

50.     Brougher immediately added significant value to the Company.  Under her guidance, revenue growth accelerated each quarter since she joined, especially in the third and fourth quarters of 2018, before the Company's IPO on April 18, 2019.  During this time, the Company increased its advertiser base from 10,000 to 80,000 and expanded its operations to twenty countries.  This growth laid the groundwork for a successful IPO.

51.     In addition, in January 2019, Pinterest unveiled its new company values at a company event in San Francisco, presenting Brougher as the champion of Pinterest's "Care and Candor" value. This value was meant to encourage employees to challenge people directly while maintaining a respectful work environment.  As such, Pinterest praised Brougher for her authenticity and leadership during the event.

52.     Unfortunately, Brougher would soon learn that this was all lip service.  A year into her employment and just before the IPO, Brougher learned that her equity compensation fell far behind her less-qualified male peers.  When she was first hired, Brougher was told that the Board had directed that executives receive backloaded equity grants, meaning that the majority of the shares would vest in the last two years of the grant.  Specifically, Brougher's equity grant provided that only 10% of her shares vested the first year, 20% vested the second year, 30% vested the third year, and 40% vested the fourth year.  Brougher believed that this vesting schedule was standard for Pinterest executives at her level. And as the Company approached its IPO, Pinterest offered Brougher an IPO retention grant that was even more backloaded.  Specifically, starting in March 2019, Brougher was to receive stock over five years with the last two years making up most of the reward, with zero vested in the first year, and 90% vested over the last two years of the grant.

53.     However, when Brougher reviewed drafts of the Company's Form S-1 filing ahead of the IPO, she learned that she was the only executive on the leadership team given this backloaded deal.  The male executives had been given more favorable vesting schedules, with their initial equity grants not backloaded and their IPO retention grants much less backloaded.  Moreover, the Form S-1 filing reflected the salaries of Pinterest's highest-paid employees, and Brougher was not on the list.

54.     Brougher's closest peer, defendant Morgenfeld, had 812,500 options which vested in his first year, compared to Brougher's 300,000 shares.  In other words, for her first year, Brougher received 37% of the equity that defendant Morgenfeld received for his first year.

55.     Brougher raised her concerns over the disparate pay with defendant Silbermann, who told her to work it out with the human resources ("HR") department.

56.     Aside from the disparate pay, Brougher found herself being blatantly discriminated against by certain of the Individual Defendants as well as retaliated against for speaking up about the pay disparities.  Brougher recalled that she was excluded from key Board meetings, Ads team meetings, and analyst days, unlike before, when she had regularly attended these meetings early on in her tenure.  The Company also kept her in the dark about important initiatives and did not consult her on major decisions affecting her department, including a consequential change the engineering team made to the ad targeting system.  As a result of this change, the Company suffered a serious drop in revenue shortly after they went public.  Further, defendant Silbermann would make important decisions in sidebar conversations, usually with two or three of his lieutenants, invariably men, who often did not have complete information.

57.     When Brougher raised concerns about product design that advertisers had brought to her attention, defendant Silbermann disinvited her from product team meetings.  As Brougher wrote:

> It was impossible to do my job if I was excluded from meetings where important decisions were made.  I had to waste time and energy just determining what was happening at a company where I was supposed to be a leader.  When [Silbermann] tried to catch me up on critical decisions after the fact, I was unable to advise him, the reason he had hired me in the first place.

58.     Indeed, defendant Silbermann's mid-year performance review of Brougher provided mixed results.  Defendant Silbermann's acknowledgment of Brougher's accomplishments focused on her relationships (such as having an operationally focused team, her ability to attract talent, and her "Care and Candor" value), but left out her concrete success in driving revenue.  Defendant Silbermann focused his critique of Brougher on her style.  Without providing substantive examples, defendant Silbermann criticized Brougher for her direct communication style for allegedly not being "collaborative."

59.     Brougher spent the following quarters of 2019 crafting detailed revenue programs, and Pinterest had its biggest fourth quarter ever.  She returned from an eight-week medical leave in January 2020.

60.     Upon her return, defendant Morgenfeld became increasingly disrespectful to Brougher, even making demeaning and sexist comments to her.  For example, in the month after Brougher's team grew revenues to their highest fourth quarter levels ever, defendant Morgenfeld sarcastically commented, in front of Brougher's peers, "What is your job anyway?"  Defendant Morgenfeld also made further reductive comments that minimized Brougher's operational achievements—including her team's outstanding revenue achievements—and which human resources acknowledged were "inappropriate" performance measures.  In February 2020, defendant Morgenfeld wrote a peer review for Brougher (although she was not asked to review him).  Defendant Morgenfeld's only comment on Brougher's achievements in 2019 was: "Seems to be a champion for diversity issues."

61.     Defendant Silbermann turned a blind eye to defendant Morgenfeld's discriminatory behavior.  Brougher texted defendant Silbermann that she was upset by defendant Morgenfeld's reductive comments, and defendant Silbermann responded that she should approach the problem with "curiosity." In direct conversations with Brougher, defendant Silbermann made clear he did not want to get involved and would not manage or confront defendant Morgenfeld.  When Brougher tried to approach defendant Morgenfeld directly to address her concerns during a video call, he responded defensively, asserting that she *was* a champion of women's issues.  Brougher candidly responded that being a female executive does not make her a champion of women's issues, nor is that the appropriate measure of her capabilities as COO.  Defendant Morgenfeld became angry, and again questioned the value Brougher's value to the Company.  He then hung up on her.  Brougher texted defendant Silbermann immediately after the call, letting him know that her conversation with defendant Morgenfeld did not go well.

62.     Pinterest's Chief Human Resources Officer, Jo Dennis ("Dennis"), met with Brougher on February 24, 2020 to discuss her call with defendant Morgenfeld.  Brougher explained that she was offended by defendant Morgenfeld reducing her accomplishments to "diversity."  Dennis agreed that this use of criteria was an inappropriate evaluation of Brougher's performance as COO.  Brougher then explained that, although she wished to find a way to work with defendant Morgenfeld, she was

uncomfortable meeting with him without someone else present until these issues were resolved. Instead of trying to mediate the disagreement between the two employees, Dennis began managing Brougher's concern as a possible legal issue, escalating her complaint to Pinterest's in-house counsel.

63.     That same day, Brougher met with defendant Silbermann, and explained that defendant Morgenfeld's comments toward her were demeaning and offensive, and that she felt tired of the abuse and uncomfortable meeting with him without a witness present. To her surprise, defendant Silbermann responded that the situation was akin to an old couple fighting over who would make coffee, again deflecting his responsibility as the head of the Company, and again subjecting Brougher to more sexist remarks.

64.     On March 26, 2020, Dennis contacted Brougher, backtracking on her prior statements and instead stating that defendant Morgenfeld's feedback was appropriate because he believed his statement to be true, i.e., that Brougher was seen as an advocate for diversity. On April 2, 2020, defendant Silbermann terminated Brougher's employment, citing her "cross-functional" relationships as the reason for her termination. Surprisingly, he asked her to transition her responsibilities to defendant Morgenfeld over the next month.

65.     Ultimately, rather than implementing an independent and proper investigation into defendant Morgenfeld's behavior, defendant Silbermann replaced Brougher with defendant Morgenfeld. Adding insult to injury, defendant Silbermann asked Brougher to announce that she decided to *leave* the Company by choice and to sign a nondisclosure agreement. Brougher rightfully refused.

66.     On August 11, 2020, Brougher filed a lawsuit against Pinterest in the Superior Court of the State of California for the County of San Francisco, alleging the gender-based discriminatory actions against her as described herein. On December 14, 2020, Pinterest paid $22.5 million to settle the lawsuit.

**Pinterest's Public Policy Manager Alleges Discrimination Based on Gender and Race**

67.     Ozoma is an American policy expert and equity advocate. Ozoma graduated from Yale University. Prior to joining Pinterest, Ozoma worked in public policy roles at Google and Facebook. Ozoma joined Pinterest in July 2018, becoming the second employee named to the public policy and social impact team. Her colleague would be Charlie Hale ("Hale"), a White male that Pinterest employees knew to be personally close to defendant Silbermann, according to *Business Insider*. Ozoma and Hale

- 17 -

1  would split the work equally.

2      68.    Soon after starting her employment, Ozoma learned that Pinterest was paying Hale

3  substantially more compensation for doing comparable work, based on the public policy team's "level

4  chart," a document that lays out the "role expectations" for each employees at each of the salary levels

5  for the job family.  In particular, each business unit within Pinterest has its own pay scales that set out

6  pay ranges in a series of levels based on a set of criteria.  Most business units, including the business unit

7  that contains the public policy group, have eight levels.  Pinterest's managers are given discretion to set

8  a new employee's pay within the range for her level.

9      69.    Before signing with Pinterest, Ozoma was told that her compensation was the best the

10  Company could do for her role.  In September 2018, however, she learned that she was hired at a Level

11  4, the second-lowest level for her team.  Hale, who had less relevant public policy experience than

12  Ozoma, was paid at the highest pay level for the team, at Level 8.

13

14

15

16

17

18

19

20  

21

22

23

24

25

26

27  <sup>1</sup> All references to "PINS-PETRETTA_____" are from the Section 220 Documents produced in response

28  to plaintiff's inspection demand.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

70.     However, other Pinterest employees recognized that Hale had less relevant public policy experience than Ozoma.  At least one employee who had previously worked directly with Hale found, when later working with Ozoma, that Ozoma had significantly more experience working with nonprofits and governmental agencies than Hale did.  Yet Ozoma was paid at a salary level much lower than Hale. Her salary disparity—about $64,000 annually—was significant but not as meaningful as the stock grant given to every employee based on their position, and hers appeared to be roughly 30,000 shares short of what her job description merited.  According to Ozoma, her post-IPO shares could have amounted to a value close to $2.5 million over a four-year period of vesting.

71.     Ozoma tried to negotiate a pay raise.  However, instead of being given a meaningful promotion at the end of 2018, Hale publicly rebuked her during a Pinterest's women's group event—a panel on how women should negotiate for pay increases.  During his message at the panel, Hale looked directly at Ozoma and told her to "adjust your expectations," and that "you should only ask for what you deserve."

72.     Despite Hale's dismissiveness, Ozoma continued to pursue equal leveling and pay and continued her diligent work.  Ozoma developed Pinterest's misinformation and disinformation policy.  In February 2019, Pinterest implemented that policy to prohibit anti-vaccination content on the platform to combat health misinformation and ensure a positive and safe user experience for Pinterest users.  Pinterest was celebrated for its health policy in the *Wall Street Journal*, CNN, NPR, Fast Company, and other news outlets as a positive example of a social media company responding to misinformation.  Notably, this positive news cycle occurred right before the IPO.  As the leader of this policy, Ozoma was cited as Pinterest's public spokesperson on the issue.

73.     Despite her celebrated achievements, Ozoma could not get the Company to pay her fairly for her diligent work.  After months of unsuccessfully trying to get her pay level changed, Ozoma finally hired a lawyer.  When Ozoma's attorney asserted in May 2019 that Pinterest should have hired her at a Level 6, the Company responded that Ozoma lacked the necessary years of experience to be assigned a higher pay level, a criteria that did not appear on the level chart.

74.     In the face of the Company's inaction, Ozoma filed a claim against Pinterest with the DFEH in July 2019.  The complaint alleged pay discrimination based on sex and race.  Ozoma's claims were confidentially resolved.

75.     The Company's dismissiveness of Ozoma did not end at her pay.  Pinterest's management also failed to take protective measures against a June 2019 "doxing" cyberattack—a practice where private or identifying personal information of an individual is published on the internet, typically with malicious intent—against Ozoma and other employees.  Specifically, in or around June 2019, a Pinterest employee released internal documents on alt-right forums and websites.  In the face of resulting public Twitter posts from alt-right posters urging the release of Pinterest employees' personal information, Ozoma and Banks internally raised the possibility of an imminent doxing attack to multiple team leads, including the Company's legal department.  Pinterest's management team, however, dismissed these concerns.  Ozoma called Pinterest's response to the alleged doxing "dangerously inadequate."

76.     As she predicted and feared, Ozoma and other employees' personal information was leaked online.  According to Ozoma, "[m]y cell phone number, my full name, my photo, my email was shared all over the Internet.  …  It was on YouTube, Facebook, Instagram, Reddit, the 'chans,' so 4chan and 8chan." After her personal information was released online, Ozoma received death threats and threats of sexual violence.

77.     Ozoma raised the issue with defendant Silbermann, texting him screenshots and images of the harassment and threats to her life.  Surprisingly, the Company made no effort to conduct an independent investigation into the doxing concerns, and Ozoma received no follow up from defendant Silbermann or anyone else at Pinterest.

**Another Public Policy and Social Impact Manager Alleges Discrimination Based on Gender and Race**

78.     Banks is another victim of Pinterest's pervasive discriminatory culture.  Banks joined the same public policy group as Ozoma as its Head of Federal Affairs in May 2019.  Previously, Banks, who holds a Masters in Science degree from Oxford University, had spent six years at Google and had served as an appointee at the White House Office of Management and Budget under President Barack H. Obama. Banks identifies as a Black and Japanese woman.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

79.     At Pinterest, Banks and Ozoma worked on initiatives including prohibiting health misinformation on the Pinterest platform and ending the platform's promotion of slave plantations as wedding sites.  These initiatives were key to developing Pinterest's brand and fostering its purported efforts to be a diverse and inclusive company.  Banks was also instrumental in opening Pinterest's Washington D.C. office and representing Pinterest with government officials and leading federal affairs for the Company.

80.     When Banks was hired in May 2019, she was told that she would play an equal role with Hale, and that her promotions would be based on the quality of her work rather than tenure.  She was also informed that Ozoma, another Black woman employee, had a personal role in designing the Company's compensation level chart.  This, of course, was not true.

81.     As shown by her efforts, and as corroborated by her coworkers, Banks' work at Pinterest was coequal with that of Hale and Ozoma.  Specifically, Banks decided the division of labor for the three team members, she served as Pinterest's representative with government officials, she led the opening of the Company's Washington D.C. office, she led the Company's sustainability efforts, and she established Pinterest's philanthropic arm.

82.     Nevertheless, Banks soon discovered that Pinterest hired her at a Level 5, several pay levels below Hale's salary level at Level 8.  When Banks approached Hale for a promotion after discovering the pay inequity, she received the same dismissive attitude that Ozoma experienced.  Indeed, in the fall of 2019, Banks raised concerns to HR about Hale's behavior towards her, including racially charged comments he had made about her ethnic background, and remarks about her "tone."   HR responded that Hale had no "ill intent," and therefore did not violate Pinterest's Code.

83.     Banks encountered further troubles at Pinterest in or around December 2019, when she discovered the Company was not paying holiday pay to its lowest-paid contract workers, many of which "were black and brown people and some were disabled."  With the help of hired consultants, Banks crafted a policy to grant the contract workers holiday pay.  To her shock, a senior executive within Pinterest's legal department sent Banks a scathing e-mail, despite the lawyer saying that the Company would adopt the proposal.  Still, Banks later learned that the mere proposal had embarrassed an upper manager, and after one senior executive accused her of lying about using the consultant, Pinterest hired

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

a private investigator to investigate and interrogate her.  According to Banks, "[i]t was a torturous experience."  The Company never released its findings from the investigations, and Banks was left in the dark as to its results.

84.  In retaliation, Pinterest stripped Banks of her responsibilities, and halted all conversations about promotions and career path.  Instead of getting praise for her policy work and a pay raise, she got a poor review and no increase.

85.  Like Ozoma, Banks filed a complaint with the DFEH in January 2020, alleging pay discrimination based on sex and race as well as retaliation for reporting the discrimination.  Banks' claims were confidentially resolved.

86.  Both Banks and Ozoma resigned in May 2020.

**Ozoma and Banks Go Public About the Discriminatory Culture at Pinterest**

87.  On June 2, 2020, in response to national protests and concern over racial discrimination and violence against minorities in the United States, Pinterest released an advertisement purporting to have an "open conversation," in which the Company attempted to profit from its diversity efforts.  The advertisement featured stories from the Company's Black employees concerning "the pain and fear they feel everyday living in America [and] [t]heir first-hand, lived experiences of racism and injustice."  Pinterest stated, "[w]ith everything we do, we will make it clear that our Black employees matter, Black Pinners and creators matter, and Black Lives matter."

88.  When Ozoma saw Pinterest's statement, she decided to post on Twitter to tell the truth—calling out the Company's leadership for profiting from diversity while promoting an internal culture of discrimination, unfair pay, and retaliation.



Ifeoma Ozoma @IfeomaOzoma · Jun 15, 2020

I shouldn't have to share this story in the year of our Lord, 2020 - but here we are. I'm an alum of Yale, Google, FB, in the WaPo Tech 202 Network, etc… and recently decided to leave @Pinterest, which just declared 'solidarity with BLM.' What a joke. 🙄 1/
#BelieveBlackWomen

💬 206      🔁 5.1K      ♡ 12.7K      ⬆

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020          ···
As a Black woman, seeing @Pinterest's middle of the night "Black
employees matter" statement made me scratch my head after I just fought
for over a full year to be paid and leveled fairly... 2/



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020          ···
A year in which I:
a) was doxxed by a white male colleague - he shared my cell number, photo,
& name w/ violently racist/misogynistic parts of the internet (followed up by
a dangerously inadequate response from @Pinterest - there's so much more
to this horrible story😩) 3/

♡ 22          ⟲ 384          ♡ 2.8K          ⤒



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020          ···
b) continued to serve as the leader of/spokesperson for @Pinterest's
biggest Public Policy wins. See: *scores* of articles and interviews on
addressing health misinformation, emotional well-being, stopping
promotion of plantation wedding venues. 4/



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020          ···
c) kept all the above quiet for "professionalism," and in the hope that
@Pinterest would do the right thing. Instead, they doubled down on
retaliation. 1 wild ex: My manager gave me bad perf review feedback for not
both-sidesing the promo of slave plantations. I have receipts. 5/

♡ 20          ⟲ 319          ♡ 2.6K          ⤒



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020          ···
Now, @Pinterest is claiming to be "Listening and Acting", mere *weeks*
after replacing me and another Black woman colleague who also decided to
leave, with...you guessed it. 🙃 6/



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020          ···
Replying to @IfeomaOzoma
I am SO proud of the initiatives I led in my time there - addressing health
misinfo decisively is no longer novel thanks to that work. I just wish it wasn't
sullied by the racism, gaslighting, & disrespect from my manager, skip level,
and the company's legal & HR leadership. 7/

♡ 13          ⟲ 212          ♡ 2.9K          ⤒

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020

Racism is dehumanizing and exhausting. I busted my ass at Yale, Google, then Facebook before Pinterest recruited me as the *second hire* on the global Public Policy team. I led work that raised our public policy profile globally. It didn't matter because I'm a Black woman. 8/

💬 9          �thumb 299          ♡ 3K          ⬆



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020

I've seen examples of genuine contrition and even *reparation* this past week from others. I hope @Pinterest takes this opportunity to "express not only [their] solidarity but also [**follows through** on their] commitment to taking action." 9/



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15, 2020

Sharing this is scary, especially after being doxxed & knowing the many forms corp retaliation can take. I owe it to myself and Black colleagues still there to hold the company to the commitments it made. @Pinterest, Black employees do indeed matter. Pay us fairly. Period. 10/10

89.     Like Ozoma, Banks tweeted her displeasure with Pinterest.

90.     Having been up to this point unresponsive to Banks' and Ozoma's complaints, defendant Silbermann issued an e-mail within hours of these tweets disputing the claims and referencing the internal investigations conducted into Ozoma's and Banks' claims.  He claimed that "[t]he investigations found that we treated these employees fairly."

91.     This attempt to muddle Pinterest's true misogynistic culture, however, was unsuccessful. Soon after, on June 20, 2020, eleven additional employees publicly shared their stories of Pinterest's "dog-eat-dog," "chaotic," and "toxic" culture.  These employees' concerns included that Black employees would be fired or "pushed out" after meeting or exceeding their performance goals; that "[p]oor management skills created a culture of firing that left everyone fighting for recognition"; that women were underpaid relative to male counterparts who did similar work; that when complaints were made to HR, HR automatically sided with managers; and that minority employees who had created value received negative reviews while their managers were promoted.

92.     A *Washington Post* article issued on July 4, 2020 described worse conduct, describing how a Pinterest executive joked that one black female former employee should act as "the servant" and "serve" her co-workers at a team dinner.  In particular, the article stated:

> One black female former employee said she was told to stop speaking in meetings and watched her manager use the presentations she created to speak to clients instead.  The woman, who was the only black person on her team, said an executive joked that she should act as "the servant" and "serve" her co-workers at a team dinner.  "Everyone knew it was wrong, but nobody said anything in that moment," said the ex-employee, who said she was too scared of retaliation to report the incident to HR.

> Another black ex-employee said a top marketing executive told her that she was surprised that marketing material showed a black woman, created by the ex-employee, was successful.

93.     On August 14, 2020, in response to the flood of Twitter posts and news articles concerning the bigoted culture at Pinterest, over 200 Pinterest employees staged a virtual "walkout," calling on defendant Silbermann to change the Company's discriminatory policies.  In an online petition in support of the changes, workers wrote: "These are not isolated cases.  Instead, they are representative of an organizational culture that hurts all Pinterest workers, and keeps us from achieving our mission of bringing everyone the inspiration to create a life they love."  These revelations generated massive public outrage.  A petition calling on Pinterest to pay its Black employees fairly garnered 25,000 signatures.

94.     In its investigative report on the Company, *Business Insider* confirmed that Ozoma's and Banks' experiences were not isolated incidents.  In addition to speaking with Ozoma and Banks, *Business Insider* spoke with nine other former Pinterest employees who left the Company between 2019 and May 2020.  These employees stated they reported their concerns about their managers and the Company's toxic culture to the HR department, sometimes multiple times, but felt as if their complaints "went into the garbage."  As one former employee stated, "I've worked in tech my whole career, at Google, Facebook, Pinterest, and it's a pattern at all of them.  But Pinterest is particularly bad."  The anonymous employees detailed the toxic culture at Pinterest for *Business Insider*, including an abusive environment, singling out of Black employees, and unfair pay for women.  In particular, the article states:

- People, especially Black employees, were suddenly fired or "pushed out" after meeting and exceeding their performance goals.

- A "macho" culture saw employees yelled at, publicly humiliated, or reduced to tears at work.

- Poor management skills created a culture of firing that left everyone fighting for recognition. Internal teams felt pitted against each other and took credit for each other's work.

- Multiple people suffered stress-induced conditions. Some required medical treatment, including for "stroke level" high blood pressure, clinical depression, and post-traumatic stress disorder.

- Many women believed they were underpaid compared with what male coworkers were earning.

- Human resources routinely sided with managers when complaints were made, multiple people said. Those employees then often received negative reviews, despite meeting performance goals, while managers were promoted, they said.

95.     After news circulated about Pinterest's toxic culture, defendant Silbermann sent an e-mail to all employees, recognizing that "parts of our culture are broken."

96.

97.

98.

99.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8    100.    
9
10
11
12
13
14
15    101.
16
17
18
19
20
21            .
22    102.
23
24
25    103.
26
27
28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

[REDACTED]

## **DAMAGES TO PINTEREST**

104.   As a result of the Individual Defendants' misconduct and breaches of fiduciary duty, Pinterest has violated federal and state laws and regulations to the detriment of the Company's stockholders.   Federal and state regulatory and government agencies have the authority to impose significant monetary fines and sanctions if they find that Pinterest's conduct violated these laws and regulations.

105.   Pinterest's performance issues also damaged its reputation within the business community and in the capital markets.   Pinterest's current and potential customers consider a company's ability to comply with the law and not to engage in a pattern of unlawful race and gender discrimination and retaliation.   Businesses are less likely to award contracts to companies violate the law as a result of systemic, discriminatory internal policies.   Pinterest's ability to raise equity capital or debt on favorable terms in the future is now impaired.   In addition, the Company stands to incur higher marginal costs of capital and debt because the discriminatory culture and violations of law by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company. Moreover, the Company's unlawful discriminatory practices have caused it to lose high quality employees, and potential high quality employees are less likely to join a company that engages in these practices. [REDACTED]

106.   Further, as a direct and proximate result of the Individual Defendants' actions, Pinterest has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

      (a)   costs incurred from defending and paying any settlement in the actions for violations of employment laws;

      (b)   costs incurred to investigate wrongdoing;

      (c)   costs incurred to implement corrective or remedial measures by virtue of a settlement or compromise; and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Pinterest.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

107.    Plaintiff brings this action derivatively in the right and for the benefit of Pinterest to redress injuries suffered, and to be suffered, by Pinterest as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Pinterest is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108.    Plaintiff will adequately and fairly represent the interests of Pinterest in enforcing and prosecuting its rights.

109.    Plaintiff has continuously been a stockholder of Pinterest since May 2019.

110.    The current Board of Pinterest consists of the following nine individuals: defendants Jordan, Kilgore, Levine, Rajaram, Reynolds, Sharp, Silbermann, and Wishom, and nondefendant Salaam Coleman Smith ("Smith").  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

111.    As alleged above, defendants Jordan, Kilgore, Levine, Rajaram, Reynolds, Sharp, Silbermann, and Wishom (eight of the current nine directors) breached their fiduciary duties of loyalty by consciously permitting or otherwise failing to act, stop, and remedy the systemic discrimination, harassment, and retaliation at Pinterest, despite numerous warnings and indicators. ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████  As a result, Pinterest has suffered damages from several lawsuits concerning the Company's discriminatory and unlawful conduct.  Pinterest's reputation has also suffered harm due to the public reports of the toxic culture it has built for its employees.  Defendants Jordan, Kilgore, Levine, Rajaram, Reynolds, Sharp, Silbermann, and Wishom face a

substantial likelihood of liability for their misconduct.  Accordingly, demand is futile as to defendants Jordan, Kilgore, Levine, Rajaram, Reynolds, Sharp, Silbermann, and Wishom.

**Demand Is Excused Because the Board Cannot Conduct an Independent and Objective Investigation into the Wrongful Conduct**

112.    Defendants Silbermann, Sharp, Levine, and Jordan exercise complete voting control and veto power over the election of all directors, as well as virtually all other corporate matters involving a stockholder vote.  Together, defendants Silbermann, Sharp, Levine, and Jordan control over 62% of Pinterest's voting power.  By virtue of their ownership and control over Pinterest's voting power, these defendants exercise control over the Board.

113.    Specifically, Pinterest has issued two classes of stock—Class A common stock and Class B common stock.  On all matters submitted to a vote of stockholders—such as the election of directors—the holders of the shares of Class A and Class B common stock vote as a single class.  Each share of Class A common stock is entitled to one vote per share and each share of Class B common stock entitled to *twenty* votes per share.  Class B common stock was awarded to Pinterest's cofounders, including defendants Silbermann and Sharp, and major pre-IPO investors, including Andreessen Horowitz (represented on the Board by defendant Jordan) and Bessemer Venture Partners (represented on the Board by defendant Levine).  As the 2020 Form 10-K explains, Class B holders control approximately 78.4% of the voting power, thus controlling all matters submitted to stockholders for approval.  In particular, the 2020 Form 10-K states:

> Because of the 20-to-1 voting ratio between our Class B and Class A common stock, the holders of our outstanding Class B hold approximately 78.4% of the voting power of our outstanding capital stock as of December 31, 2020. Because the holders of our Class B common stock hold in the aggregate significantly more than a majority of the combined voting power of our capital stock, such holders (which include all of our pre-IPO stockholders, including those holders unaffiliated with any of our co-founders, executive officers, employees or directors) control all matters submitted to our stockholders for approval.

*        *        *

> As a result, for the foreseeable future, holders of our Class B common stock could have significant influence over the management and affairs of our company and over the outcome of all matters submitted to our stockholders for approval, including the election of directors and significant corporate transactions, such as a merger, consolidation or sale

of substantially all of our assets, even if their stock holdings were to represent in the aggregate less than 50% of the outstanding shares of our capital stock. In addition, this may prevent or discourage unsolicited acquisition proposals or offers for our capital stock that you may feel are in your best interest as one of our stockholders. These holders of our Class B common stock may have interests that differ from yours and may vote in a way with which you disagree and which may be adverse to your interests. This control may adversely affect the trading price of our Class A common stock. Despite no longer being employed by us, Paul Sciarra, one of our co-founders, remains able to exercise significant voting power. If we terminate our other co-founders' employment, they would also continue to have the ability to exercise significant voting power to the extent they were to retain their Class B common stock while our other existing holders disposed of their Class B common stock.

114.    Due to defendants Silbermann, Sharp, Jordan, and Levine's complete control over the Board by virtue of their control and ownership of the Company's voting power, defendants Kilgore, Rajaram, Reynolds, and Wishom, and nondefendant Smith are incapable of impartially considering a demand to commence and vigorously prosecute this action.   Accordingly, demand is futile as to defendants Kilgore, Rajaram, Reynolds, and Wishom, and nondefendant Smith.

115.    In addition, the Board's tangled web of close professional and personal relationships amount to conflicts of interest that have precluded, and will continue to preclude, it from taking the necessary and proper steps to investigate and remedy Pinterest's unlawful conduct.

116.    Two of the Company's Board members (defendants Silbermann and Sharp) are not independent by definition and as admitted in Pinterest's 2021 Definitive Proxy Statement on Schedule 14A filed with the SEC on April 14, 2021.

117.    **Defendant Silbermann:** The principal professional occupation of defendant Silbermann is his employment with Pinterest, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, defendant Silbermann lacks independence from defendants Jordan, Kilgore, Levine, Rajaram, Reynolds, Sharp, and Wishom, and nondefendant Smith, due to his interest in maintaining his executive position at Pinterest.   This lack of independence renders defendant Silbermann incapable of impartially considering a demand to commence and vigorously prosecute this action.   Pinterest paid defendant Silbermann the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2020 | $197,100 | - | $2,000 | $199,100 |
| 2019 | $197,100 | $45,745,013 | $280,000 | $46,222,113 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| 2018 | $197,100 | - | - | $197,100 |
|------|----------|---|---|----------|

118.    Accordingly, defendant Silbermann is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.  Demand is futile as to defendant Silbermann.

119.    **Defendant Sharp:** The principal professional occupation of defendant Sharp is his employment with Pinterest, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, defendant Sharp lacks independence from defendants Jordan, Kilgore, Levine, Rajaram, Reynolds, Silbermann, and Wishom, and nondefendant Smith, due to his interest in maintaining his executive position at Pinterest.  This lack of independence renders defendant Sharp incapable of impartially considering a demand to commence and vigorously prosecute this action.  Pinterest paid defendant Sharp the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2020 | $330,000 | - | $2,000 | $332,000 |
| 2019 | $330,000 | $45,745,013 | - | $46,075,013 |

120.    Accordingly, defendant Sharp is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.  Demand is futile as to defendant Sharp.

121.    **Defendant Jordan** will not vote to initiate litigation against defendants Silbermann and Sharp due to their long-standing personal and professional relationships.  Defendant Jordan is a managing partner at Andreessen Horowitz, an early investor and substantial owner of Pinterest's Class B common stock.  In fact, Pinterest was one of defendant Jordan's first investments when he moved into venture capital, and its IPO was the first in his tenure as an investor.  Defendant Jordan has named defendants Silbermann and Sharp as the reason for Andreessen Horowitz's substantial early investment in Pinterest.  This long-standing personal and professional relationship, and the potential reputational harm to defendant Jordan's firm, raise a reason to doubt that he would vote to initiate litigation against defendants

Silbermann and Sharp.  This lack of independence renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.  Demand is futile as to defendant Jordan.

122.  **Defendant Levine** will not vote to initiate litigation against defendants Silbermann and Sharp due to their long-standing personal and professional relationships.  Defendant Levine is a partner at Bessemer Venture Partners, another early investor and substantial owner of Pinterest's Class B common stock.  Defendant Levine has stated that his meeting with defendant Silbermann in early 2011 was the reason for Bessemer Venture Partners' substantial early investment in Pinterest.  This long-standing personal and professional relationship, and the potential reputational harm to defendant Levine's firm, raise a reason to doubt that he would vote to initiate litigation against defendants Silbermann and Sharp.  This lack of independence renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.  Demand is futile as to defendant Levine.

123.  **Defendant Rajaram** has close personal ties to Andreessen Horowitz.  Defendant Rajaram currently serves on the executive team at DoorDash, Inc., where he leads Caviar.  Andreesen Horowitz currently invests in DoorDash, Inc., and was an early investor in Caviar.  Further, defendant Rajaram currently serves on the board of Coinbase, Inc. with Marc Andreessen, founder of Andreessen Horowitz.  As a result of this entanglement with Andreessen Horowitz, defendant Rajaram is incapable of impartially considering a demand to commence and vigorously prosecute this action.  As a result, demand is futile as to defendant Rajaram.

124.  **Defendants Kilgore and Wishom** together currently sit on the board of Nextdoor, Inc.  These overlapping directorships raise a reason to doubt that defendants Kilgore and Wishom would vote to initiate litigation against each other.  As a result of these entanglements, defendants Kilgore and Wishom are incapable of impartially considering a demand to commence and vigorously prosecute this action.  As a result, demand is futile as to defendants Kilgore and Wishom.

## <u>COUNT I</u>

### Against the Individual Defendants for Breach of Fiduciary Duty

125.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.     The Individual Defendants owed and owe Pinterest fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Pinterest the highest obligation of loyalty and care.

127.     The Individual Defendants and each of them, violated and breached their fiduciary duties.

128.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing about the pervasive culture of racism and sexism at Pinterest.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

129.     The Director Defendants, as directors of the Company, owed Pinterest the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the pervasive culture of racism and sexism at Pinterest.  The Director Defendants knew or were reckless in not knowing that the Company's systemic culture of discrimination, harassment, and retaliation would damage the Company.  Accordingly, these defendants breached their duty of loyalty to the Company.

130.     The Audit Committee Defendants breached their fiduciary duty of loyalty by failing to address and remedy the red flags concerning internal reports of discrimination, harassment, and retaliation.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately address the Company's failure to comply with the law, as required by the Audit Committee Charter in effect at the time.

131.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Pinterest has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

132.     Plaintiff, on behalf of Pinterest, has no adequate remedy at law.

## <u>COUNT II</u>

### Against the Individual Defendants for Unjust Enrichment

133.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

134.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Pinterest.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Pinterest.  The Individual Defendants participated, authorized, or otherwise permitted the pay discrimination at Pinterest, and as a result of their bad faith conduct, unjustly received compensation that was tied to the Company's financial performance.  As described herein, Pinterest's financial performance was, in part, the result of its senior-level employees' diligent work efforts and initiatives, for which they were not fairly compensated.

135.     Plaintiff, as a stockholder and representative of Pinterest, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

136.     Plaintiff, on behalf of Pinterest, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Pinterest, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B.     Directing Pinterest to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Pinterest and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

    1.     a proposal to strengthen the Company's controls over its employment policies concerning discrimination, harassment, and retaliation;

    2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

3.      a provision to permit the stockholders of Pinterest to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Pinterest has an effective remedy;

D.      Awarding to Pinterest restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 14, 2021

ROBBINS LLP
BRIAN J. ROBBINS
SHANE P. SANDERS
GREGORY E. DEL GAIZO
MATIAS MONTILLANO

*/s/Brian J. Robbins*
BRIAN J. ROBBINS

5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile (619) 525-3991
E-mail: brobbins@robbinsllp.com
ssanders@robbinsllp.com
gdelgaizo@robbinsllp.com
mmontillano@robbinsllp.com

Attorneys for Plaintiff

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Howard Petretta, hereby declare as follows:

I am a stockholder of Pinterest, Inc. and have been a stockholder continuously since May 2019. I have retained competent counsel and am ready, willing, and able to pursue this action vigorously on behalf of Pinterest, Inc. I have reviewed the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 7/12/2021 _____

DocuSigned by:

Howard Petretta
E9E77206A14B445

HOWARD PETRETTA